Mississippi Levee Commissioners *v.* Refuge Cotton Oil Company.

[44 South., 828.]

Levee Taxes. *Statutory construction. Words and phrases. " Cotton." " Seed Cotton." " Linters." " Grabboll cotton." Laws 1896, § 16, ch. 156, p. 172. Laws 1904, § 5, ch. 90, p. 126.*

The words " lint cotton " in Laws 1896, § 16, ch. 156, p. 172, imposing a levee tax thereon, and " cotton " and " seed cotton " in Laws 1904, § 5, ch. 90, p. 126, making it unlawful to remove the same from the levee district without paying the tax, are limited to lint cotton ginned by ordinary gins, and do not embrace " linters " or " Grabboll cotton," obtained by reginning, with improved machinery, cotton seed and former refuse cotton substances from which the lint was not wholly removed by ordinary ginning.

From the chancery court of, first district, Bolivar county. Hon. Percy Bell, Chancellor.

The Board of Mississippi Levee Commissioners, appellant, was complainant in the court below; the Refuge Cotton Oil

Company, appellee, was defendant there.    From a decree dismissing the suit complainant appealed to the supreme court.

The appellant began suit in the chancery court against the appellee, a domestic corporation, charging that defendant company, between September 1, 1904, and the date of filing of the bill, May 9, 1907, had been engaged in reginning cotton seed, after the lint had been partially removed by its ordinary gins and the plantation gins of the community; the reginning being accomplished by the use of two distinct machines or gins, one known as the Grabboll machine, which gins hard locks of cotton and cotton mixed with hulls and other substances refused by ordinary gins, the cotton thus separated being of a grade commonly known as "Grabboll cotton"; the other known as a delinter, a machine which takes lint from previously ginned cotton seed, the cotton thus separated from the seed being known as "linters" or "delinter cotton"; that defendant, within the period mentioned, had, in violation of the statutes of the state, removed from the Levee District a large number of bales of Grabboll cotton and of linters, without paying the statutory cotton tax, thus subjecting itself to a penalty of $10 for each bale of said cotton so removed.    The bill sought to enforce a lien on certain real estate in the county owned by the defendant, and its prayer was for a discovery and an accounting, in order to ascertain the amount due complainant, and for a decree for the amount so found due.

The court below sustained the defendant's general demurrer and dismissed the bill.

The statutes referred to above and under which complainant seeks to recover are § 16, ch. 156, p. 172, of the Laws of 1896, as follows:

"Section 16. That a tax of one-fifth of one cent per pound be and the same is hereby levied on all lint cotton annually grown in said district, and the sum of one-fifteenth of one cent per pound is hereby levied upon each and every pound of cotton in the seed raised and grown in said district and not ginned

therein, which tax shall continue until the year 1897, after which time said tax upon cotton may be, by resolution of the board of Mississippi levee commissioners, repealed and abolished; provided, however, that the tax on cotton shall never be abolished so long as any bonds of said levee board, which shall have been issued prior to March 30, 1892, are outstanding unless by written consent of the holders."

And § 5, ch. 90, 126, of the Laws of 1904, as follows: Section 5. It shall be unlawful for any one to remove, or cause to be removed, from the Mississippi Levee District any cotton grown therein, without first paying the levee tax thereon, and anyone so removing such cotton without paying such tax and without the consent of the levee board of said district, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than ten dollars, nor more than one thousand dollars, or be imprisoned in the county jail of the county wherein the offense occurs, not less than thirty days, nor more than one year, for each offense, and one-half of any fine so collected shall go to the informer, and, in addition, the board of Mississippi levee commissioners shall be entitled to recover from the person so removing such cotton a tax of ten dollars per bale, or one dollar per hundred pounds of seed cotton, on all cotton so removed, and such tax shall be a lien upon all cotton, or other property belonging to the party so removing such cotton."

*Fontaine Jones,* for appellant.

To establish appellee's liability for the cotton taxes in question, the concurrence of two things is all that is required: first, the cotton must have been grown within the Mississippi Levee District; and, second, the removal by appellee of such cotton from such district without first paying the levee taxes thereon and without consent of the levee board of the district. Laws 1904, p. 126; Laws 1906, p. 115. The bill of appellant, inasmuch as it distinctly alleges these two things, and inasmuch

as it is to be considered as true on demurrer, accordingly shows, without question, the liability of appellee.

The law levies the tax on all lint cotton grown in the Mississippi Levee District, regardless of the gin used, and regardless of whether the cotton has been ginned once or more than once.

Appellee's oil mill, located at Rosedale, on the banks of the Mississippi River, receives the full benefit of levee protection. Why should its cotton escape taxation? Certainly the law gives it no special privileges. The act of 1896, p. 172, levying the tax of one-fifth of one cent per pound on all lint cotton annually grown in the district, is unambiguous, and could not be made plainer or more simple in its language. But, even if the law were ambiguous, the rule is that tax laws should be liberally construed in favor of the state. *Adams* v. *Illinois Central R. R. Co.*, 71 Miss., 752; *Bacon v. Board Commissioners,* 126 Mich., 22; s.c., 86 Am. St. Rep., 524.

Taxes are levied for the support of government, and all property made liable for contribution to this object by the Constitution and laws of the state ought to be embraced in assessments for that purpose. It is not only the duty of the Legislature to reach all descriptions of property for the sake of justice to all citizens, but the interests of the state require it. *O'Neal* v. *Virginia Bridge Co.,* 18 Md., 1; *Chicago* v. *Martin,* 173 Ill., 243; s.c., 64 Am. St. Rep. 110.

Learned counsel for appellee lay stress upon the fact that the United States Census Bureau, in some of its printed tables showing cotton production in the United States, uses the words, "total crop, including linters," in stating the number of bales of cotton produced. But the very fact that linters were included with the other cotton shows that, in the opinion of the census bureau, linters are as much cotton as is upland, sea-island, benders, staple, or other class of cotton. See United States Census Bulletin of 1907, p. 75. But why is it that "Grabboll cotton" is not mentioned in the census bureau

bulletins? The answer is, that such cotton really is included in the class designated as upland cotton, there being but two other classes, sea-island and linters, mentioned in the census tables, and it cannot be supposed that " Grabboll cotton " is included in either of these latter classes. It follows that " Grabboll cotton " and linters are nothing but raw, or lint, cotton, pure and simple; and as such must be subject to the taxes.

The United States Census Bureau's definition of linters is as follows: " A short fiber called ' linters ' obtained by the cotton seed oil mills from reginning cotton seed before extracting the oil, is included in the reports of raw cotton. This cotton is largely used in the manufacturing of mattresses, batting, carpets, cheap yarn, rope, twine, and for upholstering purposes." Census Bulletin 76 (1907), page 8. In view of such definition it may be seen that there is no force in the argument advanced by learned counsel for appellee that linters should be exempted from the cotton tax because of the low price at which such cotton is sold.

*Smith, Hirsh & Landau,* for appellee.

The word cotton, as used in this state, conveys, according to the popular and accepted understanding, the lint removed from the seed by the ordinary process of ginning.

Suppose a farmer is asked, at the end of the cotton season, how many bales of cotton did you raise on your place this last year, and he would say, fifty. The man who asked the question and the farmer who answered it, would both understand that they were talking about the amount of lint cotton that he derived from his seed cotton by ginning.

Suppose a cotton buyer should agree to sell five hundred bales of cotton to a mill at New Bedford, Massachusetts, for twelve and one-half cents per pound delivered, and the mill at New Bedford would agree to receive, accept and pay for this five hundred bales of cotton at this rate. Would a court seri-

ously entertain the proposition that a delivery of five hundred bales of linters or delinted cotton or of Grabboll cotton by the cotton buyer would be a compliance with his contract?

The words "seed cotton" have just as definite, accurate and popular use or meaning as the word "cotton," and these words at once convey the idea, when used, of cotton which has been gathered and not yet ginned. In other words, seed cotton means cotton as it is taken from the stalk, and which has never been subjected to any process of ginning.

The courts approach the interpretation of a statute with the presumption that words and phrases therein are used in their familiar and popular sense, and without any forced, subtle, or technical construction to limit or extend their meaning. 26 Am. & Eng. Ency. of Law, p. 605. Sutherland on Statutory Construction, § 247. *Green* v. *Weller,* 32 Miss., 678.

The absurdity of the appellant's position may be shown by illustrations from other products: If a specific tax were imposed upon corn, and the tax were paid, and the owner who has paid the tax should then make glucose of the corn, could it be seriously insisted that the glucose should also pay the tax? If a specific tax were levied on each pound of sugar, could it be contended that, after the sugar had paid its tax, the molasses, as a product derived from the sugar, should also pay the tax? If a specific tax, like this cotton tax, were levied on each gallon of crude petroleum, and paid, could it be seriously contended that vaseline, a by-product of the crude petroleum in question, produced by refining, should also be subject to the same tax?

Suppose an owner of land in the hills and outside of the levee district should, as is frequently done, desire to use cotton seed as a fertilizer, and suppose he were to go into the levee district and buy one hundred, or more, tons of cotton seed, and remove them from the levee district and place them upon his land. If the contention of the appellant is sound, then the purchaser of this cotton seed, who removed it from the

levee district would be subject to levee tax, and, yet, we doubt, in fact we are certain, that such a purchaser would not be pursued by the appellant and sought to. be, subjected to a penalty of $10 per bale for the linters and Gabboll cotton in such seed.

In 1879 the Legislature of the state of Alabama enacted a law which provided that " it should not be lawful for any person to sell, or offer for sale, barter, exchange, or buy, in the counties of Montgomery, etc., any cotton in the seed, or buy any cotton in the seed, which is produced in the counties of Montgomery, etc." In the case of *Mangan* v. *the State,* 76 Ala., 60, the court uses this language: " We know that ' cotton in the seed ' is not the marketable condition of the article. The laws of trade and commerce rquire that it should be manipulated and converted into what is commonly known as lint cotton."

We think this decision exactly in line with the contention of the appellee, and sustains that contention, to-wit, that the words " cotton in the seed," and " lint cotton " have a popular and accepted signification, and that they are to receive the same construction when used by the Legislature of Mississippi in the Act of 1896, § 16, and in the Act of 1904, § 5.

We have had a similar statute in this state for many years, being § 2763 of the Code of 1880, § 1012 of the Code of 1892, and § 1089 of the Code of 1906. That section reads as follows: " Any person who shall buy, sell or exchange, or receive or deliver, in pursuance of a contract of sale, or exchange, any cotton in the seed or ginned and not baled, between sunset on one day and sunrise on the next, shall, upon conviction, be punished as for a misdemeanor."

We do not think that any district attorney would, for one moment, entertain the idea of framing an indictment against any one for selling cotton in the seed between sunset on one day and sunrise on the next, predicated of a state of facts that such person had sold seed which had been ginned at an ordinary

plantation gin, and from which "the lint had been partially removed by the ordinary cotton gins." If he did, we are confident that this honorable court would not sustain a conviction. Nor do we think that after cotton in the seed had been ginned at an ordinary gin and thereafter delinted, that a district attorney would think a sale of this delinted cotton unbaled between sunset and sunrise would warrant an indictment against the person making the sale, and we are equally confident that this court would not sustain a conviction predicated of such a state of facts.

To give the construction to the act of 1904, contended for by the appellant, would be to violate the well known rule of construction that penal statutes are to be strictly construed. The appellant contends that § 5 of the Laws of 1904 is not a penal statute, but we respectfully submit that the very case of *Hodge* v. *Muscatine County,* 106 U. S., 279, shows conclusively that it is a penal statute. The Iowa Act which the supreme court of the United States had under consideration in the case of *Hodge* v. *Muscatine County,* is printed in full on page 268 of the same volume of the United State supreme court reports, and that act distinctly " assesses a tax of $300 per annum against every person, partnership or corporation, and upon the real property, and the owner thereof, within and whereon any cigarette, cigarette paper, or cigarette wrappers, or any paper made or prepared for the use in making cigarettes, or for the purpose of being filled with tobacco for smoking, are sold or given away or kept with the intent to be sold, bartered or given away under any pretext whatever." This section does not provide a penalty, as § 5 of the Act of 1904, and for this very reason, the court, in the case of *Hodge* v. *Muscatine County,* used this language : " It is not easy to draw a correct line of demarcation, between a tax and a penalty. But in view of the fact that the statute denominates the assessment of a tax, and provides proceedings appropriate for the collection of a tax, but not for the enforcement of a penalty, and does not

contemplate a criminal prosecution, we cannot go far afield in treating it as a tax, rather than a penalty."

The case of *McBride* v. *State,* 70 Miss., p. 716, is, conclusive of our contention, that § 5 is a penal statute.

An examination of the United State Census Bulletins of May, 1903, April, 1905, and April, 1906, giving statistics of the cotton crop for the respective years, will show that the United States government treats cotton separate and apart from linters, speaking of linters as "linter cotton," and of other cotton as "cotton."

It is a custom so generally known that we suppose the court might take judicial knowledge of it, that owners of farms and plantations rent to their tenants at so much "lint cotton" per acre. The quantity of "lint cotton" agreed upon as rent varies, according to the productiveness of the soil. In the Delta it runs from seventy-five to ninety pounds of "lint cotton" per acre, and in all instances, both in the Delta and in the Hills, this is to be paid from the first pickings. If the contention of the appellant is well founded, then the tenant could pay his rent in linters or delinted cotton, and we do not believe that the learned counsel for the appellant, if he is so fortunte or unfortunate as the case may be, as to own a plantation in the Delta, would, for one moment, think that any tenant of his had a right to pay his rent in linters or delinted cotton.

The same illustration can be used with Grabboll cotton, and we have no doubt but that the learned counsel would reject a tender by one of his tenants in payment of rent of Grabboll cotton, with equal emphasis and in fact, we might say no uncertain language. The words "cotton in the seed," used in this § 16, according to the popular and accepted usage, conveys unerringly the idea of cotton that has been picked, but not yet ginned.

Suppose we take another illustration from the familiar transactions in the ordinary course of business in Mississippi by

way of illustrating the truth of this assertion. A farmer or planter is under obligations and is indebted to his merchant or cotton factor, and along about the middle of the season when cotton is being marketed, the merchant or factor becomes anxious to know how his customer is going to come out and whether or not he is going to pay him in full. This factor or merchant then meets the farmer or planter and says to him: " You have shipped me so many bales of cotton, how many more have you to ship ? " The customer replies: " I have so many bales ginned, and I have so much cotton in the seed." According to average experience, about fifteen hundred pounds of cotton in the seed will make a commercial bale of five hundred pounds of cotton.

Acting on this statement, the merchant or factor, figures out how much more cotton his customer is going to ship him. Can it be contended that in this statement of the farmer or planter to the merchant or factor that he included linters and Grabboll cotton in the words " cotton in the seed," or would the factor, or merchant in making his computation of the number of bales that his customer would probably ship him during the remainder of the season, for one instant add linters or Grabboll cotton ? To ask this question is to answer it; this is one of the ordinary occurrences, and is a perfect illustration of the popular and accepted usage of the words " cotton in the seed."

If, however, the court should hold that our contention, that we are not subject to this tax, is not well founded, then we submit that the appellee canot be called upon to make discovery, because this would be in violation of § 26 of the Bill of Rights of the Constitution of Mississippi. *Lees* v. *United States,* 150 U. S., 476; *United States* v. *National Lead Company,* 75 Fed., Rep., 94.

Argued orally by *Fontaine Jones,* for appellant, and by *Murray F. Smith,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

Sections 16, ch. 156, p. 172, of the Acts of 1896, and § 5, ch. 90, p. 126, of the Acts of 1904, which the reporter will set out in full, must be construed together, as relating to the same general purpose and the same subject-matter. The words " lint cotton " in the first-named act, and " seed cotton " and " cotton " in the last-named act, manifestly have no sort of reference to delinted or Grabboll cotton. These words had a definite, fixed, established meaning in the Delta, where this tax was effective, which meaning was thoroughly well known in that community when the acts were passed, and which meaning manifestly excluded delinted cotton or Grabboll cotton. Many considerations make this, we think, very clear. Grabboll cotton and delinted cotton are both very low and inferior grades of cotton. They command nothing like the price in the market of ordinary lint cotton, ginned on the ordinary gins of the country. The tax, or penalty, whichever it may be, of $10 per bale, and the fine and imprisonment, are so severe as also to show that they were never intended to be applied to those who dealt in Grabboll or delinted cotton. The meaning of these words, " lint cotton," " seed cotton," and " cotton," must be defined in this statute by the court to be what they had at the time of the passage of these acts in the communities where this tax was intended to be enforced. This is a thoroughly settled canon of construction. " Courts, in construing or interpreting a statute, give much weight to the interpretation put upon it, at the time of its enactment and since, by those whose duty it has been to construe, execute, and apply it. A cotemporaneous construction is that which it receives soon after its enactment. This, after the lapse of time, without change in that construction by legislation or judicial decision, has been declared to be generally the best construction. It gives the sense of the community as to the terms made use of by the Legislature." Sutherland on Statutory Construction, § 307. In the case of *Packard* v. *Richardson,* 17 Mass., 143; 9 Am. Dec.,

123, the court said: "A cotemporaneous construction is generally the best construction of a statute. It gives the sense of the community of the terms made use of by the Legislature."

Innumerable authorities could be cited to the same effect. A single practical illustration is enough, in our judgment, to end this controversy, though many practical illustrations supporting our view could be given. It is a well-known custom that planters often rent their land for so much lint cotton per acre, varying according to the yield per acre. Suppose such a farmer should rent his plantation for five thousand pounds of lint cotton. Is it possible that such farmer could be compelled to receive, in consideration of his rent claim, Grabboll or delinted cotton? He would say, and justly say, that lint cotton meant, according to the sense of the community in which the contract was made, always and universally, the ordinary lint cotton ginned by the ordinary gins and sold in the markets of the country as lint coton. We have examined carefully the contentions of the learned counsel for the appellant, but we think the bill is founded in an entire misconception of the meaning of these terms, "cotton," "seed cotton," and "lint cotton, in the statutes referred to.

Wherefore the judgment is *affirmed.*

### SUGGESTION OF ERROR.

After the delivery of the foregoing opinion.

*A. Y. Scott* and *Frank Johnston,* for the appellant, filed an elaborate suggestion of error, alleging that the court erred in finding, as a matter of fact, that Grabboll cotton is not lint cotton; second, that the statute, in its language makes no distinction in grades of line cotton, hence the court should not so distinguish.

### RESPONSE TO SUGGESTION OF ERROR.

To which suggestion of error the court, through Whitfield, C. J., responded as follows:

We have carefully examined the suggestion of error in this case, and see no reason for any change in our opinion. Indeed, we file this response chiefly to say that, if the people of the Delta region, as a matter of public policy, desire Grabboll and delinted cotton to be made subject to the tax sought here to be enforced, they fortunately can present soon to the Legislature a bill for that purpose, which the lawmakers can adopt if it shall commend itself to their wisdom.

*Suggestion of error overruled.*